UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

CIVIL ACTION NO. 5:07-407-KKC

LYNN A. JONES,                                                        PLAINTIFF

v.                              **OPINION AND ORDER**

MICHAEL J. ASTRUE,
Commissioner of Social Security,                                     DEFENDANT

\* \* \* \* \* \* \* \*

This matter is before the Court on the Cross Motions for Summary Judgment of the Plaintiff, Lynn A. Jones [R. 11], and the Defendant, Commissioner Astrue [R. 13]. For the reasons stated below, the Court **DENIES** the Plaintiff's Motion for Summary Judgment and **GRANTS** the Defendant's Motion for Summary Judgment.

I.      **Factual and Procedural Background**

On December 16, 2004, Plaintiff Lynn A. Jones filed her application with the Social Security Administration for supplemental security income. Plaintiff alleges that she became totally disabled beginning January 1, 2001 due to a number of impairments. These impairments include the following: chronic pain in the back, neck, shoulders, and extremities; arthritis; headaches; heart problems; bundle branch block in the heart; bilateral hand problems; cervical spine impairment; hypertension; chronic depression; anxiety; post-traumatic stress disorder; and fatigue. *See* Transcript [hereinafter "Tr."] at 66, 87; ALJ's Opinion at 3; Plaintiff's Motion for Summary Judgment [hereinafter "Plaintiff's Motion"] at 10.

Plaintiff alleges that she has constant, severe pain in her back, knees, shoulders, and hips

1

which has grown increasingly worse over time due to stress and other mental-health issues.  Tr. at 66.  She states that she cannot stay in one position longer than ten to fifteen minutes without experiencing pain, that she can barely bend over, that she cannot kneel or run, and that she must walk slower because of her pain.  Tr. at 68.  She claims that she can only stand for one to two hours, can only sit for two hours, and can lift and carry only twenty-five pounds or less.  Tr. at 137.  Plaintiff weighed 260 pounds one year ago; she now weighs 225 pounds.  Plaintiff's daily activities consist of household chores, including vacuuming, dusting, doing laundry, and washing dishes; going shopping; watching television; preparing meals; caring for her pets; reading; knitting; gardening; and visiting family.  Tr. at 68-77.  She also walks at least one mile per day to lose weight.  Tr. at 354.  Plaintiff used to abuse alcohol and drugs, but she has not consumed alcohol since 2001 and she no longer takes drugs.  She attends monthly Alcoholics Anonymous meetings.  Plaintiff takes several medications for her impairments, including Cymbalta, Atenolol, Tramadol, and epidural shots.  Plaintiff states that these medications help alleviate her pain, but tend to make her nervous.  Tr. at 134; ALJ's Opinion at 6.  Plaintiff also took nitroglycerin, but did not like the way it made her feel.  ALJ's Opinion at 6.  She visits a cardiac clinic twice a year to obtain blood pressure medication.

Medical records from Orlando Regional Healthcare System on May 29, 1998 noted Plaintiff's anxiety, but no other psychological abnormalities.  Plaintiff had a full range of motion in her extremities, and there was an absence of pain in all systems, including musculoskeletal pain.  Tr. at 153-54.  Plaintiff has outpatient treatment records from the Physical Medicine Pain Center covering the period from January 18, 2001 to June 20, 2002.  On the initial evaluation, Dr. James Shea noted Plaintiff's headaches and knee, neck, and hand pain.  Plaintiff had marked

2

tenderness over the greater occipital nerves, consistent with an occipital neuralgia, and moderate tenderness over the cervical paraspinals and trapezius muscles. Dr. Shea also noted that Plaintiff's cervical and lumbar range of motion was significantly restricted, and that there was an ulnar neuropathy at the across elbow segment. An MRI of the lumbar spine was negative for any disc herniation, while an MRI of the cervical spine revealed a moderate size right paracentral disc protrusion. Tr. at 173. Dr. Shea recorded a whole person impairment rating of twelve percent. Tr. at 175. Plaintiff testified to radiating pain in the upper back and shoulders on physical examination. This examination also revealed dysmetria and non-uniform range of motion loss. Tr. at 165. Treatment notes up to April 17, 2002 record Plaintiff's continued complaints of neck, low back, and leg pain, as well as insomnia and headaches, the latter of which occurred two to three times per week during this time. However, the records also show that medication and other prescribed treatments effectively decreased Plaintiff's pain, making the pain "tolerable" and allowing her to function and work. Tr. at 160-72. The notes also reflect complaints of stress and depression, and state that Plaintiff had facet hypertrophy at L5/S1 and discogenic spondylosis at L4/L5. Tr. at 163.

Following a motor vehicle accident on May 11, 2002, Plaintiff was again treated at the Physical Medicine Pain Center from May 15, 2002 to June 20, 2002. On initial examination, Plaintiff complained of upper neck, shoulder, mid back, and low back pain, as well as difficulty with daily activities and body movements. Dr. Francis Brooks noted that Plaintiff had normal posture and gait, a bilaterally symmetrical thorax with normal excursions, and a regular heart rate and rhythm without murmurs. However, Dr. Brooks also noted palpable somatic dysfunction; occipital pain; muscle rigidity and decreased range of motion in the neck, back, and thorax;

3

tenderness in the neck, thorax, back, and lower extremities; diffuse pain over the paravertebral muscles; moderate pain over the cervical paraspinals; sharp, radiating pain in the posterior rib vertebral connection; and knee pain. Dr. Brooks assessed Plaintiff with cervical strain and sprain, post-traumatic occipital neuralgia, thoracic and lumbar strain, and contusions to the left knee and right tibia-fibula, rule out fracture.  Tr. at 182-87.  On her follow-up appointments, Plaintiff continued to complain of back and neck pain that radiated into the shoulders and extremities.  Dr. Brooks noted tenderness to palpation over the hip and thigh, consistent with lateral trochanteric bursitis; a non-uniform range of motion loss in the spine; pain and paresthesia during straight leg raising and palpatory compression; muscle rigidity; and tenderness.  X-rays were negative for fractures, dislocations, and scoliosis, and revealed normal lordotic curvature, normal height and alignment of the vertebral bodies, straightening in the cervical spine, and a mild loss of disc height and anterior spurring at L4-5.  Tr. at 178, 181.

Plaintiff was treated at Seminole Community Mental Health Center from September 30, 2002 to November 6, 2002.  Plaintiff described a history of substance abuse, distractibility, inability to concentrate, feelings of helplessness, mood lability, and recurrent depressive episodes.  Therapist Charlene Solloway diagnosed Plaintiff with dysthymia, major depressive disorder recurrent, substance-induced mood disorder, borderline personality disorder, ETOH dependence, and cannabis dependence.  Later, Plaintiff was described as having a stable or euthymic mood and full-range or congruent affect, alert, cooperative, with organized and goal-directed thoughts.  Tr. at 189-93.  Plaintiff's global assessment of functioning [hereinafter "GAF"] score was forty at her admission and fifty at discharge.  Tr. at 190.  Plaintiff received outpatient treatment from Central Florida Regional Hospital from March 28, 1999 to January 29,

4

2003.  There was no evidence for edema, mass effect, or intracranial hemorrhage and a noncontrast CT scan of Plaintiff's brain was unremarkable.  During this treatment, on January 29, 2003, Plaintiff's back, neck, and extremities were described as "non-tender" and she was considered alert and oriented times three.  An x-ray revealed spondylosis or spurring, and Plaintiff received clinical impressions of hematoma and contusion.  Tr. at 198-99, 201-02, 209.

Plaintiff also received outpatient treatment at Orlando Regional South Seminole Hospital from September 1, 1999 to October 4, 2003.  In 1999, Plaintiff complained of dizziness and sleeping difficulties, and there was no tenderness in her joints and muscles.  Tr. at 245-46.  By March 2000, Plaintiff was complaining of neck, back, chest, and cervical pain, and was diagnosed with osteoarthritis.  Plaintiff was cleared to work one day after checking in.  Her chest was normal.  Tr. at 242-44.  On May 11, 2002, Dr. Robert Hudak noted that Plaintiff had mild degenerative changes at L4-5 with osteophytosis and slight disc space narrowing; disc space narrowing and osteophytosis at T8-9, T9-10, and T10-11; degenerative changes of the lower thoracic spine; osteophytosis at C5-6; and a possible subcentimeter cyst of the liver.  Dr. Hubak further noted that Plaintiff had no fractures, thoracic spine alignment was within normal limits, that there were no acute traumatic lesions, and that a CT scan of the brain was normal.  Tr. at 233-37.  An x-ray revealed mild spondylosis on the lumbar spine.  Tr. at 236.  Plaintiff was diagnosed with backache NOS, chest pain NOS, abdominal pain unspecified, and alcohol abuse unspecified.  Tr. at 221.

From January 28, 2004 to May 5, 2004, Plaintiff was treated by the Seminole County Sheriff's Office Department of Corrections.  It was noted that Plaintiff had back, neck, and joint/muscle problems; high blood pressure; bronchitis; arthritis; back pain; psychiatric problems;

5

and a history of substance abuse.  Tr. at 271-72.  Plaintiff's initial mental-health assessment stated that she had no problems sleeping and no abnormalities with her thought pattern, but that she took medication for depression.  Tr. at 268.  Physicians' notes from February 2004 stated that she had feelings of hopelessness and a depressed and irritable mood, but had no suicidal ideas.  Tr. at 261.  Plaintiff also submits medical records from Central Florida Family Health Center covering the period from October 22, 1998 to June 2, 2004.  On May 3, 1999, Plaintiff was diagnosed with very mild osteoarthritic changes in the left hip.  Tr. at 330.  In May 2000, Plaintiff was diagnosed with arthritis, and by February 2001, she also complained of neck pain and was diagnosed with depression.  Tr. at 314, 317.  Later that year, it was noted that Plaintiff's depression is controlled on medication and that she was experiencing joint pain.  Plaintiff worked during this time.  Tr. at 304, 312.  Later, Plaintiff was diagnosed with chronic back pain, high blood pressure, tension/migraine headaches, obesity, and substance abuse.  Tr. at 300-01, 303.

Plaintiff was provided emergency and outpatient treatment at Mary Chiles Hospital from January 25, 2005 to August 1, 2005.  After checking in for a chronic cough, radiology reports noted degenerative changes in the spine.  Tr. at 401.  Plaintiff later complained of difficulty breathing, tightness in the chest akin to pneumonia, anxiety, heart palpitations, chest pains, and rashes.  Tr. at 382-86, 390-95.  Plaintiff's medication was changed and she was instructed to return if her condition worsened.  Tr. at 388, 399.  Plaintiff also received treatment at Post Clinic from September 1, 2004 to November 30, 2005.  Assessments throughout this period of time included depression, hypertension, insomnia, back pain, chronic cough, and sinusitis.  Tr. at 430-41.

Plaintiff again sought treatment from Mary Chiles Hospital from April 25, 2006 to

6

December 1, 2006.  Treatment notes are indicative of chronic low back pain, described as constant, stabbing, and radiating.  Tr. at 443-59.  There was no evidence of nerve root compression.  At the start of this treatment, it was noted that Plaintiff had a normal range of motion in her joints.  Tr. at 455.  During this time, Plaintiff underwent three medical procedures to treat degenerative disc disease of the lumbar spine, lumbar facet anthropathy, and bilateral lumbar facet disease.  Plaintiff reported that her pain was alleviated after these procedures.  Tr. at 444-46.  Radiology reports stated that Plaintiff's vertebral bodies were of normal height, that there was a slight narrowing of the disc spaces at L4-5 and L5-S1, and that there were sclerotic changes of the facet joints at L5-S1.  Tr. at 443.

Plaintiff also sought psychological counseling and treatment at Pathways, Inc. from August 15, 2005 to November 15, 2006.  On forms and questionnaires, Plaintiff and Pathways staff noted symptoms of depression, anxiety, and post-traumatic stress disorder, and also indicated problems with Plaintiff's sleeping and concentration.  Tr. at 461-74.  A functional evaluation form also stated that Plaintiff had "extreme" limitations in several areas, such as maintaining relationships, concentration, financial matters, and physical health, and "moderate" limitations in other areas, such as activities of daily living and job performance.  Tr. at 466.  However, on an earlier diagnostic assessment, Plaintiff was described as friendly, cooperative, alert, attentive, focused, and having a full range of affect, and on a questionnaire, Plaintiff stated that her psychological impairments only caused "minor problems" with her work, family, and finances.  Tr. at 468, 473.  A diagnostic impression stated that Plaintiff had major depressive disorder, recurrent, moderate; anxiety disorder NOS; rule out post-traumatic stress disorder; and a GAF of fifty-one.  Tr. at 467.

7

Plaintiff's alleged disability was studied by two consultative examiners, Drs. James Owen and Christi Bruening.  Dr. Owen made the following findings on April 20, 2005: intermittent palpitations and chest pain, palpitations well-controlled with atenolol, Plaintiff "doing better" regarding chest pain; right bundle branch block; no significant COPD; low back pain without evidence of radiculopathy; degenerative disc disease on prior x-ray; depression; and alcoholism. Plaintiff had a mildly blunted affect and an EKG revealed a right bundle branch block, but pulmonary function studies returned normal results.  Tr. at 340-42.  Plaintiff's strength and coordination were considered normal, her reflexes were bilaterally symmetrical, and straight leg raising was negative both supine and sitting.  Tr. at 341.  Dr. Owen concluded that Plaintiff has a moderate difficulty lifting, handling, and carrying objects, and that her hearing, seeing, speaking, and ability to travel are only minimally affected.  Tr. at 341-42.

Dr. Bruening issued her evaluation on April 25, 2005.  Plaintiff appeared alert and responsive and to have a clear consciousness, and her thoughts were logical, coherent, and relevant to the topic.  Plaintiff endorsed no difficulty with her attention span and stated that she was able to complete tasks in a timely manner.  Though Plaintiff complained of sleeping difficulties, she stated that her medication helps her sleep well through the night.  Tr. at 351-54. Dr. Bruening diagnosed Plaintiff with the following: major depressive disorder, single episode, moderate, chronic; post-traumatic stress disorder, chronic; alcohol and opioid dependence with physiological dependence in sustained full remission; degenerative discs; arthritis; heart problems; symptoms of multiple sclerosis; liver damage; high blood pressure; dental problems; and a GAF score of sixty.  Tr. at 355-56.  Dr. Bruening concluded that Plaintiff's ability to understand simple instructions is unimpaired, her mental ability to sustain attention and

persistence is unimpaired, her ability to relate with others is mildly impaired, and her mental ability to adapt or respond to stress associated with day-to-day work activities is mildly to moderately impaired.  Tr. at 356-57.

In a psychiatric review technique form completed on May 16, 2005, state agency reviewing physician Dr. E.A. Ross determined that Plaintiff's ailments of major depressive disorder, post-traumatic stress disorder, and polysubstance dependency in remission cannot be considered "severe."  Tr. at 358-66.  Dr. Ross further determined that Plaintiff has mild limitations in her activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence, or pace, and that she has had no episodes of decompensation of extended duration.  Tr. at 368.  As such, Dr. Ross concluded that "[n]o severe impediment to the discrete mental aspects of work is credibly described . . . ."  Tr. at 370.  Dr. Ross's psychiatric review was affirmed by Dr. Ilze Sillers on September 27, 2005.  Tr. at 415-29.  In addition, state agency reviewing physician Dr. John Rawlings completed a physical residual functional capacity assessment on June 14, 2005.  Dr. Rawlings stated that Plaintiff can frequently lift and carry twenty-five pounds and occasionally fifty pounds, can stand, walk, and sit six hours in an eight-hour workday, and has no limitations on pushing or pulling.  Tr. at 375.  Further, Dr. Rawlings stated that Plaintiff can occasionally climb ladders, ropes, and scaffolds, and can frequently ascend stairs or ramps, as well as kneel or crawl.  Tr. at 376.  The administrative law judge [hereinafter "ALJ"] stated that these findings indicate that Plaintiff can perform a wide range of medium work.  ALJ's Opinion at 4.  Finally, Dr. Rawlings opined that Plaintiff's alleged limitations are only minimally or partially credible, and that he gave great weight to Dr. Owen's medical statement.  Tr. at 379-80.  This physical residual functional capacity assessment was

9

affirmed by Dr. David Swan on September 20, 2005.  Tr. at 406-14.

Plaintiff's disability claim was denied initially and on reconsideration.  After a March 19, 2007 administrative hearing, ALJ Gloria York issued a written opinion denying Plaintiff's application for supplemental security income.  The ALJ found that Plaintiff has a number of severe impairments, but that none of them are of listing-level severity.  Also, the ALJ determined that Plaintiff has the residual functional capacity to do a limited range of light work, and that work exists in significant numbers in the national economy that Plaintiff can perform despite her impairments.  Therefore, Plaintiff was not found to be disabled.  The Social Security Appeals Council denied Plaintiff's request for review and the ALJ's decision thus became final.  Plaintiff then brought the present action before this Court to challenge the decision of the Social Security Administration that Plaintiff is not disabled.

## II.    Standard of Review

When reviewing decisions of the Social Security Agency, the Court is commanded to uphold the Agency decision, "absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (internal quotation marks and citation omitted). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 285-86 (6th Cir. 1994). The Court is required to defer to the Agency's decision "even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ." *Jones v. Comm'r of*

*Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th

Cir. 1997)). Further, when reviewing the ALJ's decision, the Court cannot review the case *de

novo*, resolve conflicts in the evidence, or decide questions of credibility. *Nelson v. Comm'r of

Soc. Sec.*, 195 Fed. Appx. 462, 468 (6th Cir. 2006); *Garner v. Heckler*, 745 F.2d 383, 387 (6th

Cir. 1984). Where the Commissioner adopts the ALJ's opinion as its own opinion, the Court

reviews the ALJ's opinion directly. *See Sharp v. Barnhart*, 152 Fed. Appx. 503, 506 (6th Cir.

2005).

**III.    Analysis**

Plaintiff argues that the ALJ's decision, in which the ALJ determined that Plaintiff is not

disabled, is not supported by substantial evidence.  Plaintiff submits that in making her decision,

the ALJ did not give proper consideration to the effects of Plaintiff's bilateral hand problems,

cervical spine impairment, migraine headaches, and fatigue resulting from insomnia.  Due to this

error and based on the evidence of record, Plaintiff says, the ALJ's decision should be reversed

and Plaintiff should instead be found disabled.

It is the responsibility of the Commissioner of Social Security, acting through the ALJ, to

determine whether a social security disability claimant qualifies as legally disabled, and is thus

deserving of disability insurance benefits and/or supplemental security income.  *See* 20 C.F.R. §

404.1527(e)(1).  To make this determination, the ALJ must perform a five-step analysis, as

follows:

> First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful
> activity" at the time she seeks disability benefits.  Second, plaintiff must show that she
> suffers from a "severe impairment" in order to warrant a finding of disability.  A "severe
> impairment" is one which "significantly limits . . . physical or mental ability to do basic
> work activities."  Third, if plaintiff is not performing substantial gainful activity, has a

11

severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience.  Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled.  For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.

*Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing 20 C.F.R. §§ 404.1520, 404.920).  An impairment or combination of impairments is considered "severe" if it "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  Moreover, "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience."  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).  While the claimant bears the burden of proof for the first four steps of this process, if she does so, the burden shifts to the Commissioner for the final step.  *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 498 (6th Cir. 2006).

In addition, a two-part analysis is used to evaluate a claimant's credibility regarding complaints of disabling pain.  First, the ALJ must determine whether the claimant has an underlying medically determinable impairment that could reasonably be expected to produce the claimant's symptoms.  20 C.F.R. § 929(a).  Second, if such an impairment exists, then the ALJ must evaluate the intensity, persistence, and limiting effects of the symptoms on the claimant's ability to do basic work activities.  *Id.*  Relevant factors that may be considered in this evaluation include: the claimant's daily activities; the location, duration, frequency, and intensity of symptoms; factors that precipitate and aggravate symptoms; the type, dosage, effectiveness, and side effects of medication taken to alleviate the symptoms; other treatment undertaken to relieve

12

the symptoms; other measures undertaken to relieve the symptoms; and any other factors bearing on the ability of the claimant to perform basic work activities. *Id.*; *see also Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007).

In this case, the ALJ performed the required five-step analysis and determined that Plaintiff suffered from the following severe impairments: low back pain with facet anthropathy at L5-S1; a history of palpitations secondary to a right bundle branch block; obesity; major depressive disorder; post-traumatic stress disorder; borderline personality disorder; and a history of alcohol and opioid dependence in remission. ALJ's Opinion at 3. However, the ALJ then found that none of these impairments were of "listing-level severity," in that they did not meet or medically equal one of the listed impairments in the social security regulations. *Id.* at 4. Next, the ALJ determined that Plaintiff retained the residual functional capacity to perform a limited range of light work, subject to the following restrictions: lifting and carrying up to twenty pounds occasionally and ten pounds frequently; standing and walking six hours out of an eight-hour workday; limited to routine, repetitive, object-oriented tasks instead of people-oriented tasks, in a low-stress work environment. *Id.* at 4-7. Based on this, the ALJ found that although Plaintiff could not perform her past relevant work, there was work available in significant numbers in the national economy that Plaintiff could perform, including bench assembler and sorter/packer. *Id.* at 7-9. Furthermore, the ALJ followed the two-step process for evaluating complaints of disabling pain. The ALJ found that, although Plaintiff's medically determinable impairments can reasonably be expected to produce the alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible. *Id.* at 5-7. As such, the ALJ concluded that Plaintiff was not disabled and ultimately denied Plaintiff's application for

13

supplemental security income.  *Id.* at 9.  Plaintiff charges that these conclusions are not supported by substantial evidence.

To begin with, the Court notes that there is a dispute about the relevant time period from which the Court may assess evidence of Plaintiff's alleged disability.  Defendant argues that the relevant time period for considering this evidence is that from December 16, 2004, the filing date of Plaintiff's disability application, to April 27, 2007, the date of the ALJ's decision.  According to Defendant, this is supported by the social security regulations, specifically 20 C.F.R. § 416.335, and by the Sixth Circuit Court of Appeals case of *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230 (6th Cir. 1993).  Because of this, says Defendant, all record evidence pre-dating Plaintiff's December 16, 2004 filing date is irrelevant to the disability inquiry and need not be considered by the Court in its review of the ALJ's decision.

The Court does not agree with Defendant on this point.  20 C.F.R. § 416.335 states that, "[i]f you file an application [for social security disability benefits] after the month you first meet all the other requirements for eligibility, we cannot pay you for the month in which your application is filed or any months before that month."  All this regulation establishes is that benefits cannot be paid for the time preceding the application filing date; it does not speak to the scope of the medical evidence that may be considered in determining whether a claimant is disabled, and it does not foreclose consideration of evidence that precedes the filing date.  In *Casey v. Secretary of Health & Human Services*, the Court of Appeals stated, as Defendant points out, that "[t]he proper inquiry in an application for SSI benefits is whether the plaintiff was disabled on or after her application date."  *Casey*, 987 F.2d at 1233.  Again, however, this neither states nor implies that record evidence preceding the filing date cannot be considered in

14

determining whether a claimant was in fact disabled on or after her application date.  Indeed, in *Casey* itself, the Court of Appeals considered record evidence from before the claimant's filing date in affirming the ALJ's decision.  *See id.* at 1234.  If Defendant's interpretation of *Casey* is accepted, then the Court of Appeals contradicted itself by considering irrelevant medical evidence in the same case in which it defined the proper scope of relevant medical evidence.

In any case, in order to determine "whether the plaintiff was disabled *on* or after her application date," *id.* at 1233 (emphasis added), it is often plainly necessary to examine the medical evidence preceding the filing date to establish the background and context of a claimant's medical status on that filing date.  This is especially true where the claimant's alleged onset date precedes the filing date, as it does in the instant action.  In such cases, if the ALJ restricted his review of medical evidence solely to that from the filing date on, evidence contemporaneous with the start of the alleged disability period, which would be highly relevant to the ALJ's decision, would be altogether ignored.  Much of the record evidence in this case that precedes Plaintiff's filing date of December 16, 2004 is clearly relevant to the issue of whether Plaintiff became disabled on January 1, 2001, her alleged disability onset date, and whether she continued to be disabled on and after her filing date.  The Court will consider this evidence along with all other record evidence in conducting its review of the ALJ's disability determination.

Even considering this additional record evidence, however, the Court must uphold the ALJ's decision, as it is supported by substantial evidence.  This is plain from a review of the administrative record.  In May 1998, at Orlando Regional Healthcare System, it was noted that Plaintiff had no psychological abnormalities other than anxiety.  Plaintiff had a full range of motion and there was an absence of pain in all her systems, including her musculoskeletal

15

system.  Tr. at 153-54.  During Plaintiff's treatment at the Physical Medicine Pain Center in

January 2001, soon after her alleged disability onset date, Dr. Shea noted that Plaintiff only had

moderate tenderness over the cervical paraspinals and trapezius muscles, although she did have

marked tenderness over the greater occipital nerves.  Moreover, an MRI of the lumbar spine was

negative for any disc herniation and an MRI of the cervical spine only revealed a moderate size

right paracentral disc protrusion.  Tr. at 173.

In addition, despite Plaintiff's continued complaints of headaches, insomnia, and joint

and extremity pains, she admitted that her medication and other prescribed treatments lessened

her pain, allowing her to function properly, and even to work during this time.  Tr. at 160-72.

The fact that prescribed medication helps control Plaintiff's alleged pain is a factor that the Court

may take into account in reviewing the ALJ's decision.  *See* 20 C.F.R. § 416.929(c) (when

evaluating the intensity, persistence, and limiting effects of claimant's symptoms on ability to do

basic work activities, ALJ may consider the type, dosage, effectiveness, and side effects of any

medication taken to alleviate the symptoms); *see also Rogers v. Comm'r of Soc. Sec.*, 486 F.3d

234, 247 (6th Cir. 2007) (same).  This is evidence that provides strong support for the ALJ's

conclusion that Plaintiff is not disabled.

Further, in May 2002, after recording Plaintiff's complaints of pain and difficulty with

daily activities, Dr. Brooks noted that Plaintiff had normal posture and gait, a bilaterally

symmetrical thorax with normal excursions, and a regular heart rate and rhythm without

murmurs, as well as only moderate pain over the occipital nerves.  Tr. at 182-87.  X-rays taken

on Plaintiff's follow-up appointment with Dr. Brooks were negative for fractures, disclocations,

and scoliosis, and revealed normal lordotic curvature and normal height and alignment of the

16

vertebral bodies.  The x-rays also revealed some straightening in the cervical spine and only a mild loss of disc height and anterior spurring at L4-5.  Tr. at 178, 181.  During Plaintiff's stay at Seminole Community Mental Health Center during 2002, though she was initially diagnosed with a number of psychological problems, Plaintiff was later described as having a stable or euythymic mood and full-range or congruent affect, alert, cooperative, and with organized and goal-directed thoughts.  Tr. at 189-93.  Also, Plaintiff's GAF score increased by ten points during her treatment at the mental-health center.  Tr. at 190.

Throughout Plaintiff's outpatient treatment at Central Florida Regional Hospital from March 28, 1999 to January 29, 2003, no medical evidence was found for edema, mass effect, or intracranial hemorrhage, and a noncontrast CT scan of Plaintiff's brain was unremarkable.  In addition, even though Plaintiff alleges unrelenting and disabling pain in her back, joints, and extremities, at the end of her outpatient treatment, her back, neck, and extremities were "non-tender," and she was noted to be alert and oriented times three.  Tr. at 198-99, 201-02, 209.  In 1999, during Plaintiff's stay at Orlando Regional South Seminole Hospital, she had no tenderness in her joints or muscles, despite her alleged pain.  Tr. at 245-46.  In March 2000, just one day after checking into the hospital with complaints of neck, back, and other pain, Plaintiff was cleared to return to work.  Plaintiff's chest was also considered normal.  Tr. at 242-44.  In May 2002, Dr. Hubak stated that Plaintiff had only mild degenerative changes at the L4-5 region with osteophytosis and only slight disc space narrowing, in addition to other findings of degenerative changes.  Dr. Hubak also noted that Plaintiff had no fractures, that her thoracic spine alignment was within normal limits, that there were no acute traumatic lesions, and that she had a normal CT brain scan.  Tr. at 233-37.

17

Plaintiff's initial mental-health assessment at the Seminole County Sheriff's Office Department of Corrections in January 2004 was that she had no problems sleeping, had no thought-pattern abnormalities, and that she took depression medication. Tr. at 268. Records from Plaintiff's October 1998 to June 2004 treatment at Central Florida Family Health Center are also revealing. In May 1999, Plaintiff was only diagnosed with very mild osteoarthritic changes in the left hip. Tr. at 330. In 2001, treatment notes stated that Plaintiff's depression was controlled on medication, and even that she worked during this time, after her alleged disability onset date. Tr. at 304, 312. Plaintiff's 2005 medical care at Mary Chiles Hospital was very minimal: Plaintiff's medications were changed and she was instructed to follow-up if she had further problems. Tr. at 388, 399. In Plaintiff's 2006 care at Mary Chiles Hospital, which was more extensive, no evidence was found for nerve root compression and Plaintiff had a normal range of motion in her joints. Tr. at 455. Plaintiff reported that her pain was alleviated after three surgical procedures at the hospital, and x-rays indicated that Plaintiff's vertebral bodies were of normal height and that there was only a slight disc-space narrowing at the L4-5 and L5-S1 regions. Tr. at 443. This provides further evidence to support the ALJ's findings and casts doubt on Plaintiff's allegations of disabling pain.

Many of the medical records and findings regarding Plaintiff's mental health during her treatment at Pathways, Inc. are also contradictory. Although a functional evaluation form stated that Plaintiff had "extreme" limitations in the areas of maintaining relationships, concentration, financial matters, and physical health, Plaintiff had earlier been described as friendly, cooperative, alert, attentive, focused, and having a full range of affect. Moreover, Plaintiff herself stated that her psychological impairments caused only "minor" problems with her work,

18

family, and finances. Tr. at 468, 473. The functional evaluation also opined that Plaintiff had

only "moderate" limitations in the highly relevant areas of daily living activities and job

performance. Tr. at 466.

Opinion evidence also provides strong evidentiary support for the ALJ's conclusions of

non-disability. Dr. Owen stated that Plaintiff's palpitations were well-controlled with

medication, that she was "doing better" with her chest pain, that there was no significant COPD,

and that pulmonary function studies were normal. Tr. at 340-42. Furthermore, Dr. Owen found

Plaintiff's strength and coordination to be normal, her reflexes were bilaterally symmetrical, and

her straight leg raising was negative both supine and sitting. Tr. at 341. Dr. Owen's opinion of

Plaintiff's limitations was that she has only "moderate" difficulties lifting, handling, and carrying

objects, and that her hearing, seeing, speaking, and ability to travel are only minimally affected.

Tr. at 341-42. Dr. Bruening also noted that Plaintiff appeared alert and responsive and to have a

clear consciousness, with thoughts that were logical, coherent, and relevant to the topic.

Moreover, Plaintiff stated that she had no difficulty maintaining her attention span and

completing tasks in a timely manner. Plaintiff also admitted that taking her medication helps

with her insomnia by letting her sleep well through the night. Dr. Bruening opined that

Plaintiff's ability to understand simple instructions, her mental ability to sustain attention, and

her persistence are unimpaired; her ability to relate with others is only mildly impaired; and her

mental ability to adapt or respond to stress associated with day-today work activities is only

mildly to moderately impaired. Tr. at 356-57. Also, Dr. Bruening assessed Plaintiff's GAF score

to be sixty, indicative of only moderate symptoms or moderate difficulty in social or occupational

functioning. Tr. at 356; Global Assessment of Functioning Scale at 2.

19

There is additional opinion evidence from the state agency reviewing physicians which supports the ALJ's conclusions. Dr. Ross determined that Plaintiff had no severe impairments and had only mild limitations in her activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence, or pace. Tr. at 358-66, 368. This opinion was affirmed by Dr. Sillers. Tr. at 415-29. Furthermore, Dr. Rawlings stated that Plaintiff is able to lift and carry twenty-five pounds frequently and fifty pounds occasionally, that she can stand, walk, and sit six hours during an eight-hour workday, and that she has no limitations in her pushing and pulling. Tr. at 375. This assessment is consistent with an ability to perform a wide range of medium work, as the ALJ noted. ALJ's Opinion at 4. Dr. Rawlings found Plaintiff's allegations about her impairments to be only partially credible. Tr. at 379. This assessment was affirmed by Dr. Swan. Tr. at 406-14.

The extent of Plaintiff's daily activities also undermines her claims of disability and provides further evidence in favor of the ALJ's opinion. Plaintiff states that she routinely does household chores, including vacuuming, dusting, doing laundry, and washing dishes. She also leaves her home to go shopping and visit with family, she watches television, she prepares meals, she cares for her pets, she maintains gardens at her home, and she enjoys reading and knitting. Tr. at 68-77. As the ALJ pointed out, many of these activities require a great amount of concentration and persistence, casting doubt on her alleged mental limitations. ALJ's Opinion at 7. Moreover, she does the housecleaning in both her and her son's trailers, she takes care of her grandchild, and significantly, she walks at least one mile each day to lose weight. Tr. at 354; ALJ's Opinion at 7.

Finally, the ALJ also relied on several other factors that certainly provide evidence

20

supporting his decision to deny Plaintiff supplemental security income.  The ALJ noted, as this

Court has, that Plaintiff's prescribed medications helped to alleviate her complained-of pain and

had no significant side effects.  ALJ's Opinion at 6.  The ALJ also stated that, considering the

extent of all the medical problems that Plaintiff alleged, she received a relatively minimal amount

of actual medical treatment.  Even for Plaintiff's mental-impairment treatment, most of this was

only medication management and was directed primarily at maintaining sobriety, rather than

treating ongoing depression or anxiety.  *Id.*  Finally, and very significantly, the ALJ pointed out

that Plaintiff could not produce a single opinion from a treating physician or mental-health

professional opining that she is unable to perform work due to her alleged impairments. *Id.* at 7.

The Commissioner, on the other hand, has the opinions of Drs. Owen, Bruening, Ross, and

Rawlings, all of which indicate that Plaintiff is able to perform at least light work.[1]  Thus, the

ALJ held that the weight of the opinion evidence was clearly against Plaintiff.  *Id.*  The Court

agrees with these conclusions and finds that they provide strong evidence in favor of the ALJ's

determination that Plaintiff is not entitled to disability benefits.

It is clear to this Court that substantial evidence supports the ALJ's determination that

Plaintiff did not become legally disabled beginning January 1, 2001 and is not disabled now.  It

bears repeating that substantial evidence is simply "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion."  *Cutlip*, 25 F.3d at 285-86.  Therefore, if

substantial evidence supports the ALJ's decision, the decision must be upheld by the Court, even

if another outcome could reasonably have been reached from the record evidence.  *Jones*, 336

---

[1]  These opinions are not treating-source opinions, but they need not be in order to constitute
substantial evidence that the ALJ may rely on in weighing the opinion evidence.  *See* Soc. Sec. Rul. 96-
6p, 61 Fed. Reg. 34,466 (July 2, 1996).

F.3d at 475.  Since the ALJ's non-disability decision applies the correct legal standards and is supported by substantial evidence, the Court will uphold it.  *See Warner*, 375 F.3d at 390.  No reversible error was committed here.

**WHEREFORE**, the Court being sufficiently advised, and for the reasons stated above:

1.      The Plaintiff's Motion for Summary Judgment is **DENIED**; and

2.      The Defendant's Motion for Summary Judgment is **GRANTED**.

Dated this 23rd day of June, 2008.

Signed By:

*Karen K. Caldwell*

United States District Judge

22